IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA MELLOR-MILAM,<br><br>           Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>           Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>Civil Action<br>No. 13-cv-5732 (JBS)<br><br>**OPINION** |

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
102 Browning Lane, Bldg C-1
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Lauren Elizabeth Myers
Michelle Lynn Christ
Special Assistant U.S. Attorneys
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorneys for Defendant Commissioner of Social Security
     Administration

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

This matter comes before the Court on Plaintiff Lisa Mellor-Milam's appeal of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Disabled Widows Insurance Benefits and Disability Insurance Benefits under Title II of the Social

Security Act ("Act"), and for Supplemental Security Income payments under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1383(c).

Plaintiff argues that the Administrative Law Judge ("ALJ") erred in assessing the weight of two medical evaluations and in in finding that she was not fully credible. Plaintiff also argues that the ALJ erred in finding that two of her impairments were not severe; in failing to perform a function-by-function analysis in determining Plaintiff's Residual Functioning Capacity (RFC); and in relying on vocational expert testimony that was based on an inaccurate hypothetical which did not encompass all of Plaintiff's impairments. For the reasons set forth below, the Court will remand the case to the Commissioner of Social Security to reconsider Plaintiff's request for Disability Insurance Benefits.

## II.  BACKGROUND

### A. Procedural history

Plaintiff Lisa Mellor-Milam filed an application for Disability Insurance Benefits ("DIB") on February 22, 2011. On July 11, 2011, the Social Security Administration denied the claim, finding that she did not qualify for benefits because she did not have a qualifying disability. Plaintiff sought reconsideration but the application was again denied on October

3, 2011. Plaintiff then filed a Request for Hearing before an Administrative Law Judge ("ALJ") on July 12, 2012. Shortly thereafter, on July 24, Plaintiff filed applications for Supplemental Security Income ("SSI") and Disabled Widows' Insurance Benefits ("DWIB"). Pursuant to 20 C.F.R. § 404.946(b), both claims were escalated to the hearing level. The issue to be decided at the hearing was whether Plaintiff was under a disability which qualified her for benefits under the three programs.

The ALJ held a hearing on September 28, 2012, at which Plaintiff appeared with counsel and testified. A certified vocational expert, Mitchell Schmidt, also gave testimony. The ALJ issued a written decision on December 14, 2012, finding that Plaintiff did not qualify for benefits because she was not disabled under the Social Security Act and its regulations. (R. at 23.) Plaintiff requested a review of the ALJ's decision, which the Appeals Council denied on July 25, 2013. (R. at 1-6.) Plaintiff timely filed this action, which the Commissioner opposes. The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

**B. Plaintiff's Statements**

Plaintiff testified at her hearing that she was 52 years old. She was born on July 25, 1960. (R. at 49.) She graduated high school in 1978 and has an associate degree in applied

technology. (R. at 52.) Plaintiff held previous jobs as a controller, accounting manager, and transportation manager. (R. at 57-61.) Her husband passed away on May 4, 2010. (R. at 186.) Shortly thereafter, in June 2010, she lost her job as a controller for a specialty lighting company, IceCap. (R. at 57.) Plaintiff testified that towards the end, she was struggling to keep up with her job and was missing deadlines. (R. at 57.) Shortly after she was let go, the company went out of business. (R. at 58.)

One month after that, on July 15, Plaintiff was evicted from her home. (R. at 76-77.) She collected unemployment from June 2010 benefits until April 2012 and tried unsuccessfully to find part-time work as a greeter at a drugstore or desk clerk at a hotel. (R. at 55.) She has been unemployed since then. She receives income from food stamps and some money from her sister to cover her cell phone and car insurance bills. (R. at 52-53.) She is homeless, and either lives in her car or stays with friends at their house. (R. at 76.)

Plaintiff testified that she experiences discomfort and pain if she sits for a long period of time. She gets sharp pain in her joints, such as her wrists, elbows, shoulders, lower back, and knees. (R. at 62.) In addition, Plaintiff experiences a "deep aching kind of pain" in her arms, legs, and back, which she experiences "all the time." (R. at 62-63.) Cold weather,

4

rain, and changes in temperature aggravate her pain. (R. at 63.)
She testified that she experiences pain "[a]ll the time." (R. at
62, 63.) Plaintiff takes 10 milligrams of Percocet three times a
day, but the medication "doesn't take [the pain] all away." (R.
at 63.) Plaintiff has a driver's license and testified that she
drives to the store once or twice a week. She drives to the
doctor's office at least once a month. (R. at 50.) She can only
drive approximately 5 to 10 miles because she has some
difficulty with her legs and back when sitting. If she needs to
go longer distances, a friend will drive her. (R. at 50-51.) The
ALJ asked Plaintiff about various functions. Plaintiff testified
that she has difficulty sitting in a car for longer than 15 to
20 minutes. (R. at 51.) She can sit comfortably for 10 minutes
and can stand for about 10 minutes (R. at 68.) She can walk
about a block or so before getting tired and needing to sit
down. (R. at 68.) She also testified that she had difficulty
with her right arm and could only reach to shoulder height. (R.
at 70.) She sometimes drops things when her hands and her
fingers swell up in the morning. (R. at 71.) Plaintiff testified
that she can bend over but cannot touch the floor. She is able
to squat but cannot kneel. (R. at 70.)

With respect to her mental health, Plaintiff stated that
Dr. Dorfner, her family physician, was treating her for
depression and anxiety. She had not seen psychologists or

psychiatrists for her mental health problems because of insurance problems. (R. at 66-67.) Plaintiff noted that she will sometimes wake up crying or would start crying during the day. (R. at 62, 72.) She does not sleep very well, cannot remember things like she used to, and is unable to handle stress. (R. at 62, 65, 77.) Plaintiff also testified that she has difficulty with attention and concentration. (R. at 71.) She stated that she does not socialize much but will see her friend Marie on happier days. (R. at 72.) She speaks to her sister once or twice a month and writes letters to her son. (R. at 72.) When plaintiff is in a crowd of people, she will sometimes panic and get scared. (R. at 72-73.) Dr. Dorfner previously prescribed her Wellbutrin, Abilify, and Pristiq, but Plaintiff testified that she is now on Paxil. (R. at 63-64.)

With respect to daily activity, Plaintiff testified that she gets tired often and lays down about 10 times a day for "sometimes an hour, sometimes longer." (R. at 68.) She does not shower every day and has trouble with buttons and shoelaces. (R. at 74-75.) She does not do many chores at home but she can microwave meals for herself. (R. at 75.) For activity, Plaintiff testified that she watches TV, colors in a coloring book, tries to walk a bit, and sometimes walks to the end of the block where she stays to feed some stray cats. When she comes back, she lies back down and either watches TV or stares at the ceiling. (R. at

6

73-74.) Plaintiff stated that she goes to the Columbus Food Market on Thursdays once or twice a month with her girlfriends, where they get pizza from a pizza parlor and sweets from a bakery. (R. at 69, 74.)

### C. Medical History

Prior to applying for disability benefits, Plaintiff was being treated by Dr. Scott Dorfner at Dorfner Family Medicine.[1] On February 1, 2010, she was admitted to Lourdes Medical Center of Burlington County because she jammed her right toes against a wall. (R. at 298.) An X-ray showed a fracture to her fourth toe, but treatment notes indicated that her speech was clear, she was oriented, had normal affect, and responded appropriately to questions. (R. at 299.) She was seen by Dr. Dorfner two days later, on February 3, 2010. The treatment record reflected her fractured toe but did not indicate any other ailments.

A few weeks after the death of her husband, on May 28, 2010, Plaintiff was evaluated. The treatment notes from that visit indicate that Plaintiff had chronic pain, bronchitis, fibromyalgia, and severe acute respiratory (SAR) syndrome. Plaintiff was also assessed as having "anxiety/depression." She was prescribed Cymbalta and Percocet. (R. at 284.) The record shows that Plaintiff was seen twice more in 2010, once on June

---

[1] The record includes treatment notes for the time period from October 23, 2009 to January 13, 2012.

28 and once on August 24. She was assessed with chronic
obstructive pulmonary disease (COPD), SAR, chronic pain,
fibromyalgia, and anxiety/depression both times, and was
prescribed Percocet and Neurotin. (R. at 282-83.) In 2011,
Plaintiff went to Dorfner Family Medicine three times, on
February 17, August 12, and September 15. Dr. Dorfner continued
to assess her with COPD, SAR, chronic pain, fibromyalgia, and
anxiety/depression. He prescribed Percocet in February, Percocet
and Prestiq on the second visit in August, and Prestiq and
Abilify in September. (R. at 281, 308, 314.) On January 13,
2012, Plaintiff went to Dorfner Family Medicine once more. She
was again given the same diagnosis and was prescribed Abilify
and Prestiq. (R. at 313.)

   In the spring of 2011, Plaintiff was examined by multiple
physicians in connection with her February 22, 2011 application
for disability benefits. In one such evaluation, Dr. Francky
Merlin noted that Plaintiff had told him that she had
fibromyalgia and had been diagnosed with rheumatoid arthritis
two years ago. She stated to Dr. Merlin that she had pain in her
right shoulder, hands, and ankles and that she could walk a few
blocks but that her friends did her household chores. (R. at
300.) Dr. Merlin noted that Plaintiff had diminished grasping
strength in her right hand and that she could not walk on her
heels. He further noted that there was "tenderness in the right

8

shoulder" and the range of motion in her right shoulder was somewhat diminished. He scored the motor in her right hand at 4/5. (R. at 301.) Dr. Merlin observed that Plaintiff's gait was normal and that she had "no difficulty getting up from a sitting position or getting on and off the examining table." She was able to walk on her toes and flex her spine 90 degrees. He noted that she was "alert, conscious, and oriented" and "in no acute distress." (R. at 300-01.)

An X-ray of Plaintiff's left ankle and right shoulder was also conducted in the spring. The report, dated May 23, 2011 by Dr. Stephen Toder, indicated that Plaintiff had an intact left ankle with no fracture or dislocation. (R. at 302.) The report also noted that her right shoulder was intact, had a normal range of motion and had very minimal spurring of the acromioclavicular joint. (R. at 302.)

Plaintiff was also examined by a psychologist, Anna Marie Resnikoff. (R. at 303-04.) In a report dated April 25, 2011, Dr. Resnikoff noted that Plaintiff had told her that she had rheumatoid arthritis, fibromyalgia, and panic attacks. Plaintiff additionally told Dr. Resnikoff that she had attempted suicide once in the past year, but had no current ideations or plans to commit suicide. (R. at 303-04.) Plaintiff also told Dr. Resnikoff that she had trouble sleeping. She reported taking Oxycodone and Xanax. (R. at 303.) Dr. Resnikoff noted that

Plaintiff walked around carrying a stuffed animal that contained her husband's ashes and clutched the stuffed animal during the examination (R. at 303-04.) Plaintiff told Dr. Resnikoff that she was homeless and moved around from one friend's home to another. (R. at 303.)

Dr. Resnikoff observed that Plaintiff was adequately groomed, "pleasant and cooperative." (R. at 304.) Plaintiff maintained inconsistent eye contact, but Dr. Resnikoff noted that Plaintiff had unevenly paced but clear speech which was easy to understand. (R. at 304.) Dr. Resnikoff further noted that Plaintiff "was appropriately oriented to time, place, and person," had "[i]ntact reality ties," and showed no evidence of a thought disorder, hallucinations, delusions, obsessions, or compulsions. (R. at 304.) Plaintiff was able to respond to numerical calculations, could identify five common objects in the room and had delayed recall of those objects, and could recall up to six digits forwards and backwards. She had no difficulty responding to questions assessing her social planning ability and capacity to formulate practical judgment. (R. at 304.) Dr. Resnikoff noted that Plaintiff had a depressed mood and maintained limited interpersonal relationships and had a limited list of daily activities. (R. at 304.) Her diagnostic impression of the Plaintiff was "[m]ajor depressive disorder single episode," panic disorder without agoraphobia, and

generalized anxiety disorder. (R. at 304.) She gave Plaintiff a Global Assessment of Functioning (GAF) rating of 35.

On August 30, 2012, approximately one month before Plaintiff's hearing before the ALJ, Plaintiff went to the emergency room and was hospitalized for several days at Robert Wood Johnson (RWJ) Hospital. According to hospital records, she had an upper respiratory infection which had progressed to shortness of breath/wheezing/dyspnea, and chest wall pain when coughing. (R. at 537.) On August 30, the day she was admitted, Plaintiff described the pain she was experiencing as sharp. She also described having a dull aching pain and constant shooting pain in her bilateral legs, shoulders, and elbows. She rated her pain level at a 5. (R. at 571.) The location and severity of Plaintiff's pain varied at different times during her hospitalization. At times, she reported having chest pain and pain in her bottom ribs. (See, e.g., R. at 429 (pain at bottom ribs and rated at 7), 434, 438, 491, 495 (chest wall and head pain at 5 and reported as being constant).) Other times, she reported having some generalized pain, arthritic pain, knee and shoulder pain, leg pain, and back pain. (See, e.g., R. at 416 (aching pain at legs and shoulders rated at 7), 424 (arthritic pain rated at 6), 426, 451, 454 (same), 457 (generalized back and joint pain rated at 6), 463, 465 (lower back pain rated at 5), 468 (same), 471, 480 (back pain rated at 9), 482, 497

11

(generalized pain), 506 (knee and shoulder pain rated at 5), 507, 522 (leg pain).) Other times during her stay, she denied having pain or discomfort or reported her pain at a 0. (See, e.g., R. at 418, 422, 436, 437, 439, 452-53, 455-56, 459, 464, 470, 473, 478, 483, 486, 492, 493, 494, 496, 504, 516, 523, 529.) One treatment record from September 3, 2012, the day before Plaintiff was released, stated that Plaintiff had chronic asymptomatic Brady episodes, exacerbation of asthma, and tracheobronchitis. (R. at 529.) Plaintiff was discharged from the hospital on September 4. At the time of discharge, her current pain level was a 2. (R. at 532.)

On October 1, 2012, a few days after Plaintiff's hearing before the ALJ, she went back to the emergency room at RWJ Hospital for pain in the left posterior auricular region of her head. (R. at 315.) After a CT scan, Plaintiff was diagnosed with trigeminal neuralgia. She was prescribed Percocet and Carbamazepine. (R. at 316.)

### III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g) to determine whether substantial evidence supports the decision to deny Social Security benefits. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). The substantial evidence standard is a "deferential standard of

review," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (internal quotations and citations omitted). It is less than a preponderance of the evidence but "more than a mere scintilla." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). If the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

In order to allow for meaningful judicial review, the ALJ must set out a specific factual basis for each finding. Baerga v Richardson, 500 F.2d 309, 312–13 (3d Cir. 1974). The ALJ may choose which evidence to credit but must consider all the evidence and give some reason for rejecting or discrediting competent evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

## IV.  DISCUSSION

### A. Legal Standard for Determination of Disability

To be eligible for disability insurance benefits, a claimant must have a "medically determinable physical or mental

impairment" that prevents him from engaging in any "substantial gainful activity" for a continuous twelve-month period. 42 U.S.C. § 1382c(a)(3)(A); Plummer, 186 F.3d at 427. A claimant lacks the ability to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B); Plummer, 186 F.3d at 427-28.

The Commissioner reviews disability claims in accordance with a five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner must determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 1520(b). If the answer is yes, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a "severe impairment," defined as an impairment "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c). A claimant who cannot claim a "severe" impairment is ineligible for benefits. Plummer, 186 F.3d at 428. Step three requires the Commissioner to compare the medical evidence of the claimant's impairment to a list of impairments presumed severe

14

enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant suffers from a listed impairment or its equivalent, she is approved for disability benefits and the analysis stops. If she does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five to determine whether the she retains the ability to engage in substantial gainful activity. Plummer, 186 F.3d at 428.

The Commissioner conducts a residual functional capacity (RFC) assessment for steps four and five. The RFC assessment considers all of the claimant's medically determinable impairments and makes a determination as to the most the claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1)-(2). In step four, the Commissioner compares the RFC to the physical and mental demands of the claimant's past relevant work to determine whether she can resume her former occupation. 20 C.F.R. § 404.1520(f). If the claimant is unable to resume her former occupation, the Commissioner will then proceed to the final step and decide whether the claimant is capable of performing other work existing in significant numbers in the national economy, taking into account her RFC and vocational factors such as age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c). The ALC may seek assistance of a vocational expert at this step. Plummer, 186

F.3d at 428 (citing <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984)).

**B. The ALJ Decision**

The ALJ issued a written opinion on December 14, 2012, in which Plaintiff's medical history and hearing testimony were discussed in detail. First, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since June 1, 2010, the date of alleged onset of disability. (R. at 24.) The ALJ further determined that Plaintiff suffered from the following "severe" impairments: osteoarthritis, major depressive disorder, panic disorder without agoraphobia, and generalized anxiety disorder. (R. at 24.) With respect to fibromyalgia and rheumatoid arthritis, the ALJ concluded that the ailments were not "severe" as defined in 20 C.F.R. § 404.1521, because the State Agency medical consultant who examined Plaintiff, Dr. Seung Park, found no objective evidence of impairments related to those conditions. (<u>Id.</u>) Notwithstanding the severity of Plaintiff's other impairments, the ALJ found that they did not meet or equal the criteria of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.)

Moving to steps four and five, the ALJ determined Plaintiff's residual functional capacity (RFC). He found that Plaintiff had the residual functional capacity to perform the exertional demands of "less than full range of light work," with

16

limitations to "frequent pushing and pulling with the dominant right upper extremity" and "frequent handling and fingering with the dominant right hand." The ALJ found that Plaintiff must also "avoid concentrated exposure to extreme cold and heat and hazards, such as unprotected heights and moving machinery." Finally, the ALJ found that Plaintiff was restricted to unskilled work involving routine and repetitive tasks. (R. at 25.)

In reaching this conclusion, the ALJ examined Plaintiff's testimony, but noted that the medical record did not support that her impairments were as severe as she alleged. In particular, the ALJ cited to the X-rays performed in February 2010 and March 2011, which noted a normal range of motion and minimal abnormalities. (R. at 27.) He also noted that Plaintiff's recent hospitalization records did not show any indication of "severe impairment causing more than minimal functional limitations," since the records showed, among other things, that Plaintiff had "full active movement of all extremities with no swelling or tenderness in the joints." (R. at 28.) The ALJ noted that treatment records from Dr. Dorfner contained "little in the way of evidence of ongoing functional limitations that would support a finding of disability." (R. at 27.) The ALJ then summarized Dr. Merlin's testimony. In particular, the ALJ noted Dr. Merlin's findings that Plaintiff

17

had diminished grasping strength and a mild reduction in motor strength in her right hand, as well as tenderness in her right shoulder with a reduced range of motion. (Id.) State Agency medical consultants, Dr. Seung Park and Dr. Martin Sheehy, had concluded that Plaintiff had the residual functional capacity to perform the full range of light work, but the ALJ stated that he gave little weight to those opinions because they were inconsistent with the overall record. (R. at 28.)

As part of the RFC determination, the ALJ examined the severity of Plaintiff's mental impairment. The ALJ found that Plaintiff demonstrated mild limitation in activities in daily living; moderate limitations in social functioning; and moderate difficulties in being able to maintain concentration, persistence or pace. The ALJ also found that Plaintiff experienced no episodes of decompensation for extended periods. (R. at 30.) In reaching this conclusion, the ALJ rejected the mental RFC assessments of two State Agency psychological consultants, Dr. Jane Curran and Dr. Joseph Wieliczko, who made assessments for the initial disability determination and upon reconsideration. Both doctors had opined that Plaintiff had no understanding and memory limitations, no sustained concentration and persistence limitations, and was not significantly limited in her ability to ask simple questions, request assistance, and maintain socially appropriate behavior, among other things. (R.

18

at 93-94, 105-06.) The ALJ explained that he gave little weight to these opinions because the record "suggests more than mild concentration, persistence, and pace limitations that restrict the claimant to unskilled work with routine and repetitive tasks, and additional limitations in interacting with coworkers and supervisors." (R. 30.)

The ALJ gave a comprehensive summary of Dr. Resnikoff's examination, largely adopting the diagnosis of major depressive disorder, panic disorder without agoraphobia, and generalized anxiety disorder. (R. at 29.) However, the ALJ discounted Dr. Resnikoff's GAF score of 35. Under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), a GAF score of 35 was consistent with

> some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

(R. at 29.) The ALJ stated that he would give little weight to the GAF score "because it is inconsistent with the doctor's own findings and the overall medical evidence of record." (Id.)

The ALJ also examined how Plaintiff described her systems and determined that her assertions concerning the severity of her impairments and their impact on her ability to work was not

supported by the objective medical evidence. (R. at 30-32.) The
ALJ found that Plaintiff's assertions were not fully credible
because the record contained several inconsistencies which
adversely affected her credibility. (R. at 31.) The ALJ
carefully discussed his bases for questioning claimant's
credibility, including the circumstances under which she stopped
working, discrepancies about her ability to kneel, and her
certifications during the course of receiving unemployment
benefits that she was willing and able to work, which
contradicts claiming disability. (R. at 31.) He also examined
her subjective complaints of constant pain and how the medical
records occasionally mentioned that she denied pain. (Id.) The
ALJ noted discrepancies between her claim of having to lie down
7 to 10 times daily, sometimes for an hour or longer, in
contrast to her testimony about going to the Columbus Market
once or twice a month with a girlfriend for a day out. (R. at
31-32.) The ALJ found that the objective medical evidence does
not reflect a basis for the restrictions on lifestyle that
claimant described. He found her credible only "to the extent
that [the evidence] support[s] a finding of being able to
perform work at the light exertional level with the cited
preclusions. (20 C.F.R. 404.1529, 416.929, and Social Security
Ruling 96-7p)." (Id. at 32.)

The ALJ then moved to step four of the sequential five-step evaluation and found that in light of Plaintiff's RFC for light work with restrictions to light, unskilled work, Plaintiff was unable to engage in her past relevant work as an accounting clerk. (R. at 32.)

Notwithstanding Plaintiff's inability to perform past work, the ALJ found that Plaintiff was not disabled because her RFC allowed to her perform other jobs which existed in significant numbers in the national economy. At the hearing, the ALJ gave the vocational expert, Mitchell Schmidt, the following hypothetical:

> Please assume a hypothetical individual of Ms. Milam's age, education and past relevant work experience who has the following residual functional capacity: light work; frequent pushing and pulling with the dominant right, upper extremity; frequent overhead reaching with the dominant right, upper extremity; frequent handling and fingering with the dominant right hand; avoid concentrated exposure to extreme cold and heat, and hazards such as unprotected heights and moving machinery. . . .

(R. at 78.) Mr. Schmidt testified that a hypothetical individual with the capabilities described could perform the occupation of garment sorter, fruit cutter, and folder, and that those jobs were a representative sampling of the jobs available, based on the Dictionary of Occupational Titles (DOT) and the Selected Character of Occupations (SCO). (R. at 79.)

Based on this testimony and on an examination of the Medical-Vocational Guidelines of Appendix 2 of the Regulations, 20 C.F.R. Subpart P, Regulations No. 4, the ALJ found that jobs existed in significant numbers which Plaintiff could perform. The ALJ noted that the Medical-Vocational Guidelines recognizes approximately 1400 light and 200 sedentary unskilled occupations, with each occupation representing numerous job titles in the national economy. (R. at 34.) The ALJ specifically mentioned Mr. Schmidt's testimony that jobs available to a hypothetical individual with Plaintiff's limitations included garment sorter, fruit cutter, and folder. (R. at 34.) The ALJ then concluded that Plaintiff's exertional and nonexertional functional limitations, as described by the RFC, did not significantly erode the range of unskilled, light jobs she could perform. (R. at 34.) Consequently, the ALJ found that Plaintiff was not disabled.

Plaintiff raises several arguments for why remand is appropriate. She contends that that the ALJ erred in discounting Dr. Resnikoff's GAF score evaluating Plaintiff's psychiatric impairment, and in failing to state the weight of Dr. Merlin's opinion. She also contends that the ALJ erred in finding that Plaintiff was only partially credible. Plaintiff argues that the ALJ erred in the RFC analysis by failing to perform a function-by-function assessment of her RFC, specifically by not

determining Plaintiff's limitations with respect to sitting, standing, walking, lifting, carrying pushing, stooping, and crouching, as required by Social Security Ruling 96-8p. Relatedly, Plaintiff contends that the ALJ's hypothetical question to the vocational expert did not accurately reflect Plaintiff's impairments. Finally, Plaintiff argues that the ALJ erred in finding her fibromyalgia and rheumatoid arthritis to be non-severe at step two, and in not considering those impairments when determining Plaintiff's RFC.

### C. The ALJ did not err in discounting part of Dr. Resnikoff's opinion

In her evaluation of Plaintiff's mental functioning, Dr. Resnikoff gave Plaintiff a Global Assessment Functioning score of 35. The ALJ explained that the DSM-IV describes a person with a GAF score of 35 as having "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." (R. at 29.) After a lengthy summary of Dr. Resnikoff's written evaluation, which the ALJ credited, the ALJ discounted Dr. Resnikoff's GAF score because it was "inconsistent with doctor's own findings and the overall medical evidence of record." (R. at 29.) Plaintiff argues that the ALJ erred in giving it little weight.

23

The GAF scale is used by mental health clinicians and doctors to assess the social, occupational, and psychological functioning of adults. Iruzarry v. Barnhart, 233 Fed. Appx. 189, 190 (3d Cir. 2007). The scale ranges from 1 to 100, with 1 describing an individual with the most serious impairment and 100 describing an individual with no symptoms. Rios v. Comm'r of Soc. Sec., 444 Fed. Appx. 532, 535 n.3 (3d Cir. 2011).[2]

The Court finds that the ALJ properly discounted the GAF score because it was unsupported by the record. (R. at 29.) The record does not show that Plaintiff suffered from any "impairment in reality testing or communication," as a GAF score of 35 would indicate. The ALJ noted that although Plaintiff maintained inconsistent eye contact and was observed clutching a stuffed animal with her husband's ashes, Dr. Resnikoff's observations show that overall, Plaintiff had no problems with speech or thinking. (R. at 29, 303-04.) The ALJ also noted Dr. Resnikoff's observations that Plaintiff was "appropriately

---

[2] At the time of the ALJ's opinion, the DSM-IV was the latest edition of the American Psychiatric Association's diagnostic manual. According to the DSM-IV, a GAF score between 41 and 50 indicates "serious symptoms," such as suicidal ideation, severe obsession rituals, or frequent shoplifting, or any "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF score between 31 and 40 describes symptoms that are even more severe, as noted above. See Rios, 444 Fed. Appx. at 534 n.3; Debaise v. Astrue, 2010 WL 597488, at *5 n. 7 (Feb. 16, 2010) (quoting American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000)).

oriented to time, place, and person," and had "intact reality ties" with "no evidence of a thought disorder." (R. at 29, 304.) Dr. Resnikoff stated that Plaintiff was able to demonstrate delayed and immediate recall skills and was able to perform numerical calculations and serial sevens. (R. at 304.) Finally, the ALJ explained that Plaintiff's speech was clear and easy to understand, albeit unevenly paced, and reiterated Dr. Resnikoff's observation that Plaintiff "displayed good general knowledge." (Id.)

Moreover, the record did not show that Plaintiff had a "major impairment" in several areas of her life, as a GAF score of 35 would indicate. Dr. Resnikoff noted that Plaintiff was in a depressed mood and had limited interpersonal relationships, but she came to the session "adequately groomed." (R. at 304.) Dr. Resnikoff also noted that Plaintiff had no difficulty with questions designed to assess social planning ability and capacity to formulate practical judgment. (R. at 304.) Although Plaintiff stated that she had tried to commit suicide once last year, she reported no current suicidal ideations. (R. at 303-04.) Plaintiff told Dr. Resnikoff that she was able to take care of her daily living means, and Dr. Resnikoff concluded that Plaintiff was able to handle funds in her best interest. (R. at 303-04.) Based on these observations, the ALJ properly stated

that the GAF score was inconsistent with the doctor's own findings.

The ALJ also properly noted that the GAF score was unsupported by the overall medical record. Comments in the "Cognitive/Perceptual/Neuro" section of Plaintiff's hospital records from her September 2012 stay at RWJ Hospital, for example, consistently state that Plaintiff was "oriented x 4: follows commands; speech spontaneous, well paced, logical; purposeful motor response; behavior appropriate to situation." (See, e.g., R. at 418, 429, 434, 446, 473, 478.) Moreover, the two State Agency psychological consultants who assessed Plaintiff's mental RFC for the initial disability determination and upon reconsideration, Dr. Jane Curran and Dr. Joseph Wieliczko, made comments that were generally consistent with Dr. Resnikoff's overall observations. Neither consultant found impairments to Plaintiff's thinking or speech, and neither consultant found that Plaintiff suffered from "major impairments" in several areas of her life. (See R. at 89-90, 93-94, 101-02, 105-06.)[3]

---

[3] The ALJ did not ultimately credit the State consultants' opinions about the severity of Plaintiff's mental limitations because the record showed that Plaintiff had greater mental impairments than what the State consultants had assessed. The Court notes only that the opinions of Dr. Curran and Dr. Wieliczdo did not contradict Dr. Resnikoff's observations.

The Court therefore finds that substantial evidence supported                                                   the ALJ's decision to discount Dr. Resnikoff's GAF score of 35.

### D. The ALJ did not err in failing to state the weight of Dr. Merlin's opinion

Plaintiff next contends that remand is required because the ALJ failed to state the weight given to Dr. Merlin's opinion. (P. Br. 16-17.) The Court holds that any error the ALJ committed was harmless.

20 C.F.R. § 404.1527 states that an ALJ should weigh each medical opinion in the case together with the rest of the evidence in the record. However, this does not impose a requirement on the ALJ to explicitly consider and state the weight of every single piece of evidence presented by a claimant. The Third Circuit has noted that in general, it is sufficient for the ALJ to have considered all pertinent, relevant, and probative evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).

It is clear in this case that the ALJ considered Dr. Merlin's report in its entirety. His summary of Dr. Merlin's two-page medical report encompassed nearly every observation Dr. Merlin made. (R. at 27.) The ALJ noted Dr. Merlin's findings about Plaintiff's physical limitations in detail, specifically noting that Plaintiff's grasping strength was found to be

27

diminished in the right hand, that she could not walk on her heels, that her right shoulder was tender with a reduced range of motion, and that she had a mild reduction in motor strength in her right hand. (R. at 27, 301) The ALJ additionally considered Dr. Merlin's findings of non-impairment, noting that Plaintiff's manipulative functions were not found to be impaired, that she could flex her spine forward, could squat and walk on her toes, had no difficulty getting up from a sitting position or off the examination table, and had full strength in her other extremities. In addition, the ALJ considered Dr. Merlin's observations about Plaintiff's normal reflexes, gait, and station. (R. at 27, 301.)

The ALJ did not "fail[] to address these objective findings in the formulation of RFC." (Pl. Br. 16.) After considering Dr. Merlin's observations, the ALJ specifically noted in the RFC that Plaintiff had some limitations to her ability to push, pull, and reach overhead with her upper right arm. (R. at 24, 27, 301.) These limitations were consistent with Dr. Merlin's earlier conclusion that Plaintiff had some impairment to her right shoulder and right hand. It was clear that the ALJ incorporated Dr. Merlin's opinion into his determination of Plaintiff's RFC, and Plaintiff has not shown otherwise. Remand is therefore inappropriate because any error in not stating the weight given to Dr. Merlin's opinion was harmless. See

Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (remand not required where ALJ did not explicitly consider obesity as a factor because record was clear that ALJ had carefully considered the relevant medical evidence and plaintiff had not shown how explicit consideration of obesity would change the outcome of the ALJ's decision); see also Caldwell v. Barnhart, 261 Fed. Appx. 188, 190 (11th Cir. 2008) (failure to state weight of medical opinion was harmless error because opinion was consistent with ALJ's findings). The Court declines to vacate the ALJ decision on this ground.

> **E. The ALJ's determination that Plaintiff's fibromyalgia and rheumatoid arthritis were not "severe" is supported by substantial evidence.**

At step two of the five-step evaluation process for determining whether an applicant is disabled, the Commissioner determines whether the claimant suffers from an impairment or combination of impairments that is "severe."  The social security regulations, which discuss the step-two severity determination in terms of what is "not severe," state that an impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The regulation further defines "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). Like any other step in the sequential analysis, a determination at step two will be upheld

if it is supported by substantial evidence on the record as a whole. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360-61 (3d Cir. 2004).

Plaintiff argues that the ALJ erred at step two by concluding that Plaintiff's fibromyalgia and rheumatoid arthritis were not severe, because that determination ignored Dr. Dorfner's diagnosis of fibromyalgia and Dr. Merlin's diagnosis of "arthritis." (Pl. Br. 24-26.) The written opinion shows that the ALJ explicitly rejected Plaintiff's claims of fibromyalgia and rheumatoid arthritis because "there [was] minimal clinical evidence in the record to corroborate or support any finding of significant vocational impact related to these conditions." (R. at 24.)

The record supports the ALJ's finding that both impairments were non-severe. First, with respect to rheumatoid arthritis, the ALJ explained that Plaintiff's allegation of having rheumatoid arthritis was not confirmed by any other portion of the record and had not been confirmed by the State Agency medical consultant, Dr. Park. (R. at 24.) Indeed, Dr. Merlin's notes show only that Plaintiff had reported having previously been diagnosed with rheumatoid arthritis, but there is no medical evidence in the record to support Plaintiff's allegation, nor has Plaintiff pointed to any. (R. at 300.) Dr. Merlin's treatment record indicates that Plaintiff had

30

"arthritis," which is not evidence of rheumatoid arthritis since it is also consistent with the ALJ's finding of osteoarthritis.

As for fibromyalgia, the ALJ explained that Dr. Park had found "no objective evidence" to establish the existence of that impairment. (R. at 24.) This too was supported by the record. Dr. Dorfner had diagnosed Plaintiff with fibromyalgia, but other treatment records failed to confirm this diagnosis. Moreover, the ALJ found Dr. Dorfner's diagnoses unconvincing, noting that the treatment notes gave the diagnosis of fibromyalgia with little explanation (R. at 27 (noting that notes "contain[ed] little in the way of evidence of ongoing functional limitations that would support a finding of disability.").) The ALJ also noted the four- and five-month gaps in office visits with Dr. Dorfner, which lends further support to his conclusion that the impairments "are not as debilitating as suggested by the claimant." (Id.) The ALJ therefore properly found that Plaintiff's fibromyalgia was not severe. See Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991) (treating physicians' opinions were not controlling because they were conclusory and unsupported by the medical evidence).[4]

---

[4] Contrary to Plaintiff's contention (Pl. Br. at 24), the ALJ did consider Dr. Dorfner's opinion in coming to this conclusion. Although the ALJ did not explicitly refer to the Dr. Dorfner's notes in step two, an explicit citation is not necessary since "we do not expect the ALJ to make reference to every relevant treatment note." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir.

Finally, because the ALJ specifically discussed Dr. Dorfner's treatment notes, which included the fibromyalgia diagnosis, reviewed Dr. Merlin's diagnosis, and discussed the symptoms arising from Plaintiff's "underlying medical determinable impairments" in the RFC analysis, Plaintiff's remaining argument (Pl. Br. 26 and Pl. Reply Br. 10), that the ALJ failed to consider her non-severe impairments in calculating her RFC, must fail.[5] See Garrett v. Comm'r of Soc. Sec., 274 Fed. Appx. 159, 163 (3d Cir. 2008) (ALJ properly omitted from the RFC analysis limitations he found less than credible).

**F. The ALJ's determination that Plaintiff was partially credible is supported by substantial evidence.**

As part of the RFC determination, the ALJ carefully evaluated Plaintiff's statements about the intensity and persistence of her symptoms. However, the ALJ did not fully

---

2001). In any event, the ALJ specifically stated in its "severity" analysis that it had conducted "a careful review of the entire record" (R. at 24), and explicitly discussed Dr. Dorfner's treatment notes in the RFC section, as noted above.
[5] Even if the ALJ erred in finding that Plaintiff's fibromyalgia and rheumatoid arthritis were not severe, that error was harmless because the ALJ ultimately found in Plaintiff's favor at step two by finding that she had other severe impairments – specifically, osteoarthritis, major depressive disorder, panic disorder without agoraphobia, and generalized anxiety disorder. See, e.g., Salles v. Comm'r of Soc. Sec., 229 F. Appx. 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [Plaintiff]'s favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless."); Barlow v. Comm'r of Soc. Sec., Civ. 13-538, 2014 WL 1225560, at *7 (D.N.J. Mar. 24, 2014) ("[A]ny error at step two was harmless because the ALJ continued the sequential analysis.").

credit Plaintiff's testimony, stating that he had "reservations" about finding Plaintiff fully credible because several inconsistencies adversely affected her credibility. (R. at 31.) Plaintiff claims that the ALJ erred in his finding of Plaintiff's credibility because the ALJ mischaracterized certain statements as being inconsistent. (P. Br. 20-22.)

Under the applicable social security regulations, a determination of disability includes a consideration of objective medical evidence and other evidence establishing a claimant's disability. Such other evidence may include a claimant's own subjective statements about her symptoms, restrictions, daily activities, efforts to work, and the like. See 20 C.F.R. § 404.1529. Allegations of pain and other subjective symptoms advanced by a claimant must be supported by objective medical evidence. Id. If the ALJ concludes that the claimant's medically determinable impairments could reasonably cause the alleged symptoms, the ALJ must examine the intensity and persistence of the pain or symptom as well as the degree to which it may limit the claimant's ability to work. Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). This requires the ALJ to decide "the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.

In making this credibility determination, the ALJ must consider a number of factors, including but not limited to the claimant's daily activities, the intensity of the claimant's pain, the medication taken, and any other treatment the claimant receives for pain. Social Security Regulation (SSR) 96-7p, 1996 WL 374186, at *3 (July 2, 1996). In particular, the ALJ must examine whether there are any conflicts between a claimant's statements and the rest of the evidence, since one "strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5; see also 20 C.F.R. § 404.1529(c)(4).

The Court finds that the ALJ's overall determination of Plaintiff's credibility was supported by substantial evidence. First, the ALJ correctly noted that Plaintiff was inconsistent about her ability to kneel. (R. at 31.) While she testified during the hearing that she could not kneel, she did not mark that she had kneeling problems in a Disability Function Report that she had filled out earlier. (Compare R. at 70 R. at 217-18.)

Second, the ALJ noted that Plaintiff applied for and received unemployment benefits after she was laid off from IceCap, which required her to certify that she was ready, willing, and able to work. (R. at 31.) Plaintiff had also

34

testified at the hearing to looking for other jobs as a greeter at Walmart, a hotel desk clerk, or drug store clerk while receiving unemployment, during the time period for which she was now claiming disability. (R. at 56.) The ALJ was did not err in considering this as a factor in evaluating credibility. Courts in this Circuit have stated that a claimant's application for unemployment compensation may adversely affect her credibility. See, e.g., Myers v. Barnhart, 57 Fed. Appx. 990, 997 (3d Cir. 2003) (noting that it was "entirely proper for the ALJ to consider that Myers' receipt of unemployment benefits was inconsistent with a claim of disability during the same period."); Barlow v. Comm'r of Soc. Sec., 2014 WL 1225560, at *9 (D.N.J. Mar. 24, 2014) (dismissing plaintiff's argument that receipt of unemployment benefits do not preclude a finding of disability and citing cases). Other circuit courts are in agreement with the Third Circuit, and Plaintiff's citation to a Ninth Circuit case, Carmickle v. Comm'r, 533 F.3d 1155 (9th Cir. 2008), is not persuasive. See, e.g., Schmidt v. Barnhart, 395 F.3d 737, 745 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely no role in assessing his subjective complaints of disability."); Workman v. Comm'r of Soc. Sec., 105 Fed. Appx.

35

794, 801-02 (6th Cir. 2004) (inconsistency in application for
unemployment benefits and disability may be considered in
evaluating credibility); Johnson v. Chater, 108 F.3d 178, 180
(8th Cir. 1997) (application for unemployment compensation
benefits may adversely affect claimant's credibility because it
admits plaintiff's ability to work).

Third, the ALJ noted that Plaintiff's complaints of
"constant pain" were not supported by hospital records, since on
several occasions she denied having any pain. (R. at 31.)
Plaintiff points to treatment notes with her primary care
provider, where on two instances her chief complaint was listed
as "pain" and "chronic pain." (Pl. Br. 22.) She also points to
selected hospital records from the first day of Plaintiff's six-
day stay at RWJ Hospital, from August 30 to September 4, 2012,
where Plaintiff complained of chronic pain. (Pl. Br. 21.)
However, a closer examination of the hospital records show that
they support the ALJ's finding. (R. at 62-63.) The treatment
records, which detail Plaintiff's condition throughout each day
of her stay, show that at times, Plaintiff did indeed complain
of joint pain (See, e.g., R. at 416, 424, 426, 451, 454, 457,
463, 465, 468, 471, 482, 497, 506, 507, 522.) But in at least
two dozen instances, Plaintiff also denied having any pain or
discomfort or reported her pain at a 0. (See, e.g., R. at 418,
422, 436, 437, 439, 452-53, 455-56, 459, 464, 470, 473, 478,

483, 486, 492, 493, 494, 496, 499, 504, 509, 516, 523, 529.) On
the day she was discharged, Plaintiff reported her pain at a
level 2. (R. at 532.) Based on these records, the ALJ properly
concluded that Plaintiff's complaints of having "constant" pain
"all the time" could not be fully credited because they were
unsupported by the evidence. (R. at 31, 62-63.)

Finally, the ALJ noted that Plaintiff's reported
limitations were at odds with her daily activities. (R. at 31-
32.) Plaintiff testified to lying down seven to ten times a day
for an hour or longer. (R. at 68.) The ALJ correctly pointed out
that needing to lie down for approximately seven to ten hours a
day was inconsistent with being able to go to Columbus Market
once or twice a month with a friend for a day of eating and
shopping. (R. at 69, 74.)[6]

---

[6] Plaintiff argues that the ALJ was wrong in finding that
Plaintiff was inconsistent in how she described her termination
from IceCap. The ALJ took issue with the fact that Plaintiff had
stated in her Disability Report - Adult questionnaire that she
was laid off because her company had gone out of business, but
testified at the hearing that she was fired for a different
reason, shortly before her company had started to fold. (R. at
31.) The Court agrees with Plaintiff that these statements were
not inconsistent. In both instances, Plaintiff maintained the
same factors that led to her termination: her declining health
and work performance and the company's going out of business.
(Compare R. at 57-58 (testifying that shortly after her employer
told her not to come back because her performance at work had
been suffering and her health was in decline, the company closed
its doors) with R. at 207 (noting in the Disability Report that
she was laid off when her company closed the doors, but that
even before that, her boss informed her that he was going to let
her go because she "cried all the time when [she] was there and

For the reasons stated above, the Court holds that the
ALJ's determination of Plaintiff's credibility was supported by
substantial evidence. Panetis v. Barnhart, 95 Fed. Appx. 454,
457 (3d Cir. 2004) ("[D]eference to the ALJ's conclusion is
especially high in reviewing the ALJ's credibility
determinations."); Dixon v. Massanari, 270 F.3d 1171, 1178-79
(7th Cir. 2001) ("Because the ALJ is in the best position to
observe witnesses, we will not disturb her credibility
determinations as long as they find some support in the
record.").

### G. The ALJ erred in failing to perform a function-by-function RFC assessment

Steps four and five of the disability determination require
the ALJ to make an assessment of the claimant's residual
functional capacity ("RFC"). 20 C.F.R. § 404.1520. The RFC is
defined as "that which an individual is still able to do despite
the limitations caused by his or her impairment(s)." Burnett v.
Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)
(quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir.
1999)). To determine a claimant's RFC, the ALJ considers how
limitations to a claimant's physical abilities, mental
abilities, and any other abilities might affect the claimant's

---

[her] health was not good at the time.").) Notwithstanding this
error, the Court finds no reason to disturb the ALJ's finding
because it was still supported by substantial evidence, as
explained above.

capacity to do work on a regular and continuing basis. 20 C.F.R. § 404.1545(b)-(d). A claimant's RFC is expressed in terms of the exertional levels of work, which range from sedentary, light, medium, heavy, to very heavy work. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

Social Security Ruling 96-8p states that the RFC "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1. The functions that must be addressed include the physical functions of sitting, standing, walking, lifting, carrying pushing, and pulling. Id. at 5. SSR 96-8p further notes that in the RFC assessment, each function "must be considered separately (e.g., 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours,') even if the final RFC assessment will combine activities." Id. "Only after the function-by-function analysis may the ALJ express the RFC in terms of the exertional levels of work." Id. at *1.

Here, the ALJ determined that Plaintiff's RFC enabled her to engage in "less than the full range of light work" with additional specified limitations. The ALJ's RFC assessment was as follows:

> . . . [T]he claimant retains the residual functional capacity to perform the exertional demands of less than a full range of light work with limitations to

39

> frequent pushing and pulling with the dominant right
> upper extremity; frequent overhead reaching with the
> dominant right upper extremity; frequent handling and
> fingering with the dominant right hand; must avoid
> concentrated exposure to extreme cold and heat and
> hazards, such as unprotected heights and moving
> machinery; and is restricted to unskilled work
> involving routine and repetitive tasks with occasional
> changes in the work setting and occasional interaction
> with co-workers, supervisors, and members of the
> public.

(R. at 25.) Plaintiff argues that the ALJ erred in not

performing a function-by-function analysis of her exertional

limitations, as required by SSR 96-8p. Specifically, she argues

that the ALJ's RFC assessment, which states only that Plaintiff

could perform "less than a full range of light work," failed to

state the amount of time Plaintiff could stand, walk, and sit,

and the amount of weight Plaintiff could regularly carry. (Pl.

Br. 17, 19.) Plaintiff further contends that had the ALJ

conducted a function-by-function analysis and found that

Plaintiff had an RFC appropriate for sedentary work, she would

have been considered disabled under the Medical-Vocational

Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix

2.

The Court finds merit in Plaintiff's argument. Although the

ALJ described Plaintiff's limitations for certain functions –

specifically, pushing, pulling, reaching, handling and fingering

– he failed to make any finding as to Plaintiff's capacity for

walking, sitting, standing, and carrying, as required by SSR 96-

8p. The only mention of Plaintiff's ability to sit, stand, walk, and carry in the ALJ's opinion was in a paragraph summarizing a State Agency consultant's assessment. The ALJ noted Dr. Seung Park's finding that Plaintiff was able to carry "ten pounds frequently and twenty pounds occasionally," and "could stand, sit, or walk for about six hours out of eight hours during a workday." (R. at 28.) But the ALJ then stated that he would give little weight to Dr. Park's opinion because it was inconsistent with the overall record. (Id.)

The absence of any finding on Plaintiff's ability to walk, sit, stand, and carry was particularly noticeable here, where Plaintiff testified at several points that she had trouble sitting and standing for long periods of time. During the hearing, Plaintiff stood up or sat down when she began to express discomfort, which the ALJ noted for the record. (R. at 52, 55, 63.) Plaintiff also told the ALJ that she had difficulty sitting for longer than 15 to 20 minutes, standing for longer than 10 minutes, and walking for long periods of time. She also stated that she sometimes used a cane to assist her in walking and balance. (R. at 51, 62, 68-69.) She estimated that she could only carry three to five pounds. (R. at 67.) Although the ALJ noted this testimony in its opinion, it was not mentioned in the RFC finding. (R. at 26.)

The Court will therefore remand this case to the
Commissioner of Social Security to determine Plaintiff's RFC on
a function-by-function basis, in accordance with SSR 96-8p. The
Court notes that remand is particularly appropriate here since
evidence on the record suggested that Plaintiff had limitations
to physical functions that could clearly affect her exertional
category. For example, the "light work" category "generally
requires the ability to stand and carry weight for approximately
six hours of an eight hour day." Jesurum v. Sec'y of U.S. Dep't
of Health & Human Serv., 48 F.3d 114, 119 (3d Cir. 1995). By
contrast, the "sedentary work" category generally requires no
more than two hours of standing or walking out of an eight hour
day. See SSR 83-10, 1983 WL 31251, at *5-6. Plaintiff's status
may very well change once all of her functional limitations are
considered in the RFC.

On remand, the ALJ should adhere to the requirements
outlined in SSR 96-8p. In particular, the ALJ should determine
the maximum amount Plaintiff can sit, stand, walk, and carry
based on the evidence in the record. In accordance with SSR 96-
8p, the ALJ should also state the specific amount of time that
Plaintiff could perform each function during an 8 hour workday.
See SSR 96-8p, 1996 WL 374184, at *7 (ALJ "must discuss the
individual's ability to perform sustained work activities" on a
regular work schedule of 8 hours a day, 5 days a week, and

42

"describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."); Pearson v. Barnhart, 380 F. Supp. 2d 496, 507-08 (D.N.J. 2005) (ALJ's failure to state the amount of time the plaintiff was able to perform each function during an eight hour day, as specified by SSR 96-8p, was error and required remand).

### H. The ALJ erred in failing to list all of Plaintiff's impairments in the hypothetical question to the vocational expert

The Court additionally finds that the ALJ erred at step five of the disability determination because the hypothetical he posed to the vocational expert did not accurately reflect all of Plaintiff's impairments. (Pl. Br. 20, Pl. Reply Br. 5-7.) At the hearing, the ALJ asked the vocational expert what jobs would be available for a hypothetical individual with Plaintiff's impairments. However, instead of a hypothetical based on Plaintiff's RFC, the hypothetical given by the ALJ was of an individual who could perform "light work; frequent pushing and pulling with the dominant right hand, upper extremity; frequent overhead reaching with the dominant right, upper extremity; frequent handling and fingering with the dominant right hand . . . ." (R. at 78.)  The vocational expert responded that, based on the Dictionary of Occupational Titles (DOT), Plaintiff could perform the occupations of garment sorter, folder, and fruit cutter, and noted that these jobs numbered in the hundreds of

thousands or over one million in the national economy. (R. at 79.) Citing this testimony and noting that the vocational expert's opinion was based on hypothetical facts that "were identical to the claimant's condition," the ALJ concluded in his written opinion that Plaintiff was "not disabled" because she could still perform a number of jobs which existed in significant numbers in the national economy. (AR. at 34.)

The Third Circuit has "stated in the clearest of terms that an ALJ's hypothetical [to the vocational expert] must include all of a claimant's impairments." Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004). Although the hypothetical need not include every single complaint alleged, it must "accurately portray" all of the physical and mental impairments that are supported by objective medical findings in the record. Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). Medically supported limitations that are not included in the hypothetical posed to the vocational expert will preclude reliance on the expert's response. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987), is instructive. In Chrupcala, the claimant argued that the vocational expert's opinion was defective because the hypothetical given by the ALJ did not reflect that the claimant suffered from constant and severe pain, which was supported by

44

objective medical evidence. The Third Circuit agreed and reversed, noting that a hypothetical question which does not reflect all of a claimant's limitations "is deficient and the expert's answer to is cannot be considered substantial evidence." Id. at 1276.

For similar reasons, remand is required here because the ALJ's characterization of Plaintiff's physical condition failed to consider all of Plaintiff's impairments. (Pl. Br. 20.) The ALJ's hypothetical was of an individual who could perform "light work" rather than "less than a full range of light work," and who could perform "frequent" pushing, pulling, overhead reaching, handling, and fingering without limitation. However, it was clear from the ALJ's RFC assessment that Plaintiff had limitations to all of these functions in her right upper extremity and right hand. (R. at 25.) Because the ALJ's proffered hypothetical question did not encompass any of these limitations, the vocational expert's answer was deficient and unreliable. The Court will therefore remand to develop vocational expert testimony based on Plaintiff's specific impairments which are supported by the record. Podedworny v. Harris, 745 F.2d at 219 (insufficiency of ALJ's hypothetical question and corresponding deficiency in vocational expert's response necessitated remand for further proceedings).

45

**V. CONCLUSION**

    For the foregoing reasons, the Court will vacate the ALJ's decision and remand for reconsideration consistent with this opinion. An accompanying Order will be entered.


**December 30, 2014**                 **s/ Jerome B. Simandle_**
Date                               JEROME B. SIMANDLE
                               Chief   U.S.   District   Judge